UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - x
                              :
JACOBY & MEYERS              :   No. 3:11CV817(RNC)
  LAW OFFICES, LLP,          :
                              :
             Plaintiff,       :
                              :
        vs                    :
                              :
JUDGES OF THE CONNECTICUT    :
 SUPERIOR COURT, ET AL,      :
                              :   HARTFORD, CONNECTICUT
             Defendants.      :   MARCH 19, 2012
                              :
- - - - - - - - - - - - - - - x
```

ORAL ARGUMENT

BEFORE:

        HON. ROBERT N. CHATIGNY, U.S.D.J.

Darlene A. Warner, RDR-CRR
Official Court Reporter

```
 1    APPEARANCES:

 2

 3         FOR THE PLAINTIFF:

 4              MEISELMAN, DENLEA, PACKMAN, CARTON & EBERZ P.C.
                     1311 Mamaroneck Avenue
 5                   White Plains, New York, New York 10605
                BY:  JAMES R. DENLEA, ESQ.
 6                   JEFFREY I. CARTON, ESQ.

 7

 8         FOR THE DEFENDANTS:

 9              OFFICE OF THE ATTORNEY GENERAL
                     55 Elm Street
                     Hartford, Connecticut 06106-1774
10              BY:  MICHAEL SKOLD, AAG
                     ROBERT J. DEICHERT, AAG
11

12              SHIPMAN & GOODWIN
                     One Constitution Plaza
13                   Hartford, Connecticut 06103-2819
                BY:  JAMES W. BERGENN, ESQ.
14                   PAUL STUART BAILIN, ESQ.

15

16              CLENDENEN & SHEA
                     400 Orange Street
                     New Haven, Connecticut 06511
17              BY:  KEVIN C. SHEA, ESQ.

18

19

20

21

22

23

24

25
```

```
 1
 2                        9:00 A.M.

 3

 4          THE COURT:  Good morning.  Would you please

 5   state your appearances.

 6          MR. DENLEA:  Yes, Your Honor, for the plaintiff,

 7   Jeffrey Carton and James Denlea from Meiselman, Denlea,

 8   Packman, Carton & Eberz.

 9          MR. CARTON:  Good morning, Your Honor.

10          THE COURT:  Good morning.

11          MR. DEICHERT:  Good morning, Your Honor, for the

12   defendants, Robert Deichert, Assistant Attorney General,

13   and Michael Skold, Assistant Attorney General.

14          MR. SKOLD:  Good morning, Your Honor.

15          THE COURT:  Good morning.

16          MR. SHEA:  Good morning, Your Honor, Kevin Shea

17   for the Connecticut Bar Association.

18          MR. BAILIN:  Good morning, Your Honor, Paul

19   Bailin of Shipman & Goodwin for the CTLA amicus.

20          THE COURT:  Good morning.

21          Have you talked about how would you like to

22   proceed this morning?

23          MR. DEICHERT:  We have not, Your Honor.  If

24   you -- do you have a preference?

25          THE COURT:  No.  I would like to give everybody
```

1    a chance to address the Court.  Since it is a motion to

2    dismiss, I trust that the defense side will go first and

3    if amici want to wait until after the plaintiff has been

4    heard from, I have no particular preference.

5             MR. DEICHERT:  That will be fine, Your Honor.

6             MR. DENLEA:  That sounds right, Your Honor.

7             THE COURT:  Fine.

8             Mr. Deichert?

9             MR. DEICHERT:  Good morning, Your Honor.  I'm

10   Assistant Attorney General Rob Deichert representing the

11   defendants, Judges of the Connecticut Superior Court, on

12   this motion to dismiss.

13             In this action the plaintiff challenges Rule 5.4

14   of the Connecticut Rules of Professional Conduct, which is

15   modeled on ABA model rule that has been implemented in

16   virtually every jurisdiction in the United States.

17             Plaintiff claims that the Connecticut rule, and

18   by extension, the other rules nationwide are

19   unconstitutional.  Plaintiff has brought three actions

20   challenging the rule, this action as well as two other

21   actions, one in the Southern District of New York and the

22   other in the District of New Jersey.

23             Our position on this motion is that this Court's

24   analysis should begin and end with Judge Kaplan's March 8

25   decision in the Southern District of New York action.  In

1       that decision Judge Kaplan analyzed New York state law and

2       concluded that New York's partnership law prohibits

3       plaintiff from having non-lawyer partners and therefore

4       imposed the independent impediment to plaintiff's

5       standings in this case.

6                  Judge Kaplan's decision is entitled to

7       collateral estoppel effect and bars plaintiff from

8       re-litigating the state law issues in this case.

9                  All four elements for collateral estoppel are

10      met here.  The questions of New York law underlying both

11      cases are identical.  The parties litigated the issue in

12      New York and Judge Kaplan decided that the Court's

13      resolution of the standing issue was necessary to its

14      judgment.  And plaintiff had a full and fair opportunity

15      to litigate the issue in New York.

16                 As this Court may have seen in our notice of

17      supplemental authority, Judge Kaplan held two separate

18      rounds of argument, reviewed two separate rounds of

19      briefing, and ultimately issued an 18-page memorandum of

20      decision concluding that New York state law barred

21      plaintiff's claims.

22                 Because each of the elements of a collateral

23      estoppel appears to be present here, that requires this

24      Court dismiss this action.  Of course this Court need not

25      address collateral estoppel if it agrees with Judge

```
1    Kaplan's decision and defendants believe Judge Kaplan's

2    decision is correct and that this Court should follow it.

3              As an initial matter, Judge Kaplan's ruling on

4    issues of New York state law is entitled to deference

5    since he is a New York district judge, possesses

6    familiarity with New York law.

7              Aside from that deference, Judge Kaplan's

8    decision was right.  New York law does not permit any LLP

9    to include limited partners.  And each partner of an LLP

10   must be a professional authorized by law to render a

11   professional service in the state.

12             Because of that independent New York impediment,

13   plaintiff lacks standing in this case because it fails to

14   allege that Rule 5.4 caused its alleged injury or that

15   invalidating the rule would redress such injury.

16             Even if plaintiffs could overcome the deference

17   to Judge Kaplan's decision and convince this Court that

18   Judge Kaplan was wrong, another provision of New York law

19   bars the investment plaintiffs seek.  Specifically section

20   491 of New York's judiciary law has been held by the New

21   York appellate division to prohibit an agreement between a

22   non-lawyer and attorneys to share in the firm's profits.

23   Under New York law that's classified as a serious crime

24   and that provides another independent bar to this Court's

25   jurisdiction, and that is a bar that Judge Kaplan did not
```

1    address because he did not need to because of his ruling

2    under the partnership law.

3            Ultimately we believe that should really end the

4    analysis in this case.  To the extent this Court

5    disagrees, the question -- Judge Kaplan, after analyzing

6    New York laws and concluding it was clear that plaintiff

7    was barred, concluded that if to the extent that it was

8    unclear, he would have abstained under the Pullman

9    abstention doctrine.

10           And our position is that his rationale with

11   regard to Pullman applies with even greater force in this

12   case given that the plaintiffs had an action in New York

13   in which they challenged the New York law, given that the

14   New York court has greater familiarity with New York law,

15   and given that to the extent the plaintiffs have concerns

16   about Judge Kaplan's ruling they have the ability to

17   appeal to the Second Circuit, which has the ability to

18   certify any questions of New York law to the New York

19   courts and to permit an expeditious ruling, something that

20   neither Judge Kaplan nor Your Honor has.

21           So ultimately defendants' position is that to

22   the extent the Court believes that there is a possibility

23   of jurisdiction, that abstention would be appropriate.

24           Aside from Judge Kaplan's ruling, which

25   addressed two of the three prongs of standing, plaintiff's

1    claim also fails the first prong of standing in that they

2    do not allege an invasion of a legally protected interest

3    that is concrete and particularized and actual or imminent

4    and not conjectural or hypothetical.  Plaintiffs bear the

5    burden of showing their claim is not hypothetical and they

6    cannot meet that burden here.  They do not allege the

7    defendants have threatened to take any action against the

8    plaintiff and, indeed, plaintiff does not allege an

9    example where the defendants have taken an action to

10   enforce Rule 5.4.

11           Primary enforcement authority for Rule 5.4 lies

12   with the statewide grievance committees and grievance

13   panels, not the defendants.  In any event, even if, it's

14   far from clear that Rule 5.4 would actually apply to

15   plaintiff.  Plaintiffs claims are unclear as to what type

16   of investments it seeks thereon and from whom and that

17   could change the analysis.

18           Moreover, under Connecticut's Rules of

19   Professional Conduct, Rule 8.5 governs choice of law and

20   provides that for conduct that does not -- is not in

21   connection with the matter pending before a tribunal, the

22   Court -- the disciplinary authorities will look to the

23   jurisdiction where the predominant effect of the conduct

24   is felt.

25           Ultimately plaintiff is a New York based law

1    firm with offices throughout the country.  Although

2    plaintiff alleges that it has an office in New Haven, it's

3    unclear how much of a presence it has in the state.

4           Given the nature of Rule 5.4, and that governs

5    issues of firm structure, it's possible a Connecticut

6    Court addressing the issue would never actually apply

7    Connecticut law as opposed to New York law.

8           For example, the New York State Bar Association

9    concluded that DC's version of Rule 5.4 would apply to

10   permit a lawyer to partner with a non-lawyer even though

11   that lawyer was sharing profits and fees from litigation

12   commenced and prosecuted in New York.

13          And, Your Honor, if I may approach, I have a

14   copy of the opinion.

15          THE COURT:  Yes, I'd be interested to see that.

16   Thank you.

17          MR. DEICHERT:  Of course the resolution whether

18   to apply its own rule or New York's rule would be highly

19   fact dependent.  Also plaintiff has not alleged sufficient

20   facts to move its claim that Connecticut would enforce its

21   Rule 5.4 against plaintiff beyond the realm of the

22   hypothetical and therefore has not met its burden to

23   establish that it has standing.

24          THE COURT:  Mr. Deichert, is there a mechanism

25   in Connecticut akin to the one that apparently exists in

1    New York that would permit a lawyer to inquire of the

2    disciplinary authority whether a particular investment

3    would be permitted?

4          MR. DEICHERT:  My understanding, Your Honor, is

5    that there is a mechanism whereby the Connecticut Bar

6    Association's Committee on Professional Ethics will

7    provide advisory opinions, but those opinions are not

8    necessarily binding on the state.

9          So I am not aware of whether the New York

10   decision was binding on the New York authorities, but my

11   understanding is ours -- it would be available and

12   certainly be persuasive but would not necessarily be

13   binding.

14         In addition to plaintiff's inability to

15   establish standing, the Eleventh Amendment also bars

16   plaintiffs claims.  The named defendant in this case is

17   the Judges of the Connecticut Superior Court as a

18   collective body, not any individual.  And therefore the

19   Eleventh Amendment bars this action as it's currently

20   pleaded.  Defendants did not respond to that argument in

21   their briefing and that alone warrants dismissal.

22         Presumably defendants will try to amend their

23   complaint to take advantage of Ex parte Young, but in

24   order to take advantage of Ex parte Young you have to

25   allege that there is a clear -- that the defendant has the

1   authority and is imminently going to exercise it to

2   enforce it.  Again, like for all the reasons we discussed

3   with regard to the hypothetical nature of plaintiff's

4   claims, there is no indication or imminent threat that

5   this rule be enforced against the plaintiff.

6           I'm happy -- I can proceed to the merits, Your

7   Honor.  I don't know if you want to hear about

8   jurisdiction.

9           THE COURT:  I think that the policy arguments

10  are very interesting but they're not my first concern this

11  morning.

12          MR. DEICHERT:  Would it make sense for me to

13  allow plaintiffs to respond on the jurisdictional issues?

14          THE COURT:  I think so.

15          MR. DEICHERT:  Thank you, Your Honor.

16          THE COURT:  Thank you.

17          MR. DENLEA:  Good morning, Your Honor.

18          Your Honor, as an initial matter, counsel for

19  the Attorney General has gone on at some length this

20  morning discussing whether or not it's a hypothetical

21  injury that was sustained by the plaintiff with respect to

22  whether or not there will be an enforcement action.

23          I don't think that there's an individual in this

24  room who believes that if our client on the way home from

25  court today stopped in Greenwich to obtain private equity

1    funding that by the time they reached the New York state

2    border that there would be an enforcement action commenced

3    against them by the defendants.  So the Rule 5.4 that has

4    been in place in Connecticut for 40 years would definitely

5    be enforced.  So to state that's hypothetical or

6    theoretical that a enforcement action will take place is

7    beyond cavil.

8              Aside from that, that's not the standard,

9    because counsel is ignoring the authority in both Babbitt

10   v. United Farm Workers as well as Steffel v. Thompson,

11   which states that the law does not require a party to,

12   quote, await and undergo a prosecution as a sole means of

13   seeking relief, closed quotes.

14             So far beyond the notion that this is

15   conjectural or hypothetical, counsel went to great length

16   in their papers to inform the Court that this was a well

17   considered policy decision of 40 years efficacy and that

18   they would in fact seek to enforce Rule 5.4 against our

19   clients.

20             THE COURT:  As a prudential matter, for the

21   Court, you're asking me to preempt the state judiciary on

22   a matter of great significance to the state judiciary

23   without having made any attempt to seek guidance from the

24   state judiciary.  In that context, I'm wondering why the

25   ripeness doctrine shouldn't be applied to require your

1    client to take steps to clarify, A, what it would like to

2    do; and B, whether it would be permitted, particularly

3    because it's not clear to me that your client has an

4    immediate stake in this rule as it exists and is

5    administered in Connecticut.

6         In that framework, can you please tell me a bit

7    more about your client's activities in Connecticut and

8    what if any impact this rule is actually having on your

9    client in Connecticut?

10        MR. DENLEA:  Yes, Your Honor.

11        As the Attorney General correctly stated, our

12   client has offices in the state of Connecticut as well as

13   I believe now 31 other states and the impact that this

14   rule has with respect to that law office and that firm is

15   that the -- the harm and the injury is consistent

16   country-wide.  That's why we commenced the actions in the

17   three states that we did.

18        And that harm is that because of the denial of

19   access to capital, that there's an increased cost of

20   capital.  And as Judge Easterbrook said in the Alliant

21   case, that that in and of itself is enough to infer

22   standing.

23        THE COURT:  Let me ask you to pause, please.

24        Where is your client's office in Connecticut?

25        MR. DENLEA:  I believe it's New Haven, Your

1    Honor.

2              THE COURT:  Is there a person who is actually

3    practicing law in New Haven?

4              MR. DENLEA:  I believe in each of the offices

5    they are staffed and there are individuals practicing law

6    in each of the states.

7              THE COURT:  You can make that representation to

8    me?

9              MR. DENLEA:  Your Honor, that is my

10   understanding and my belief.  We will confirm that at the

11   conclusion of the proceedings today.  I have absolutely no

12   reason to believe that is not the case.

13             It is not their business model to have mail

14   drops or absentee offices country-wide.

15             THE COURT:  Was the plaintiff registered to do

16   business in Connecticut at the time the complaint was

17   filed?

18             MR. DENLEA:  Your Honor, we're not 100 percent

19   certain.

20             THE COURT:  And I believe the name of the

21   plaintiff on the caption of the complaint is incorrect, is

22   that right?

23             MR. CARTON:  That was an administrative

24   oversight, Your Honor, and Judge Kaplan brought to our

25   attention that the name of the firm had been Jacoby and

1    Meyers Law Offices LLP.  They had dropped the words "Law"

2    and "Offices."

3              There was an appropriately filed registration

4    with the New York State Department, the Secretary of

5    State, correcting that.  And then subsequently Judge

6    Kaplan amended the caption.  We would do similarly here as

7    well, Your Honor.

8              THE COURT:  Okay.  Should I treat that as an

9    oral motion to amend the caption?

10             MR. DENLEA:  We would request so, Your Honor.

11   Thank you.

12             THE COURT:  Any objection to that?

13             MR. DEICHERT:  Yes, Your Honor.

14             Just to clarify a few things, we share Your

15   Honor's concern about the lack of presence in Connecticut

16   and, you know, we're prepared to provide additional

17   information that we've seen that calls in question

18   Jacoby's presence.  Specifically, and I don't know how

19   much I should get into it without having presented the

20   evidence.  If you prefer, I can wait.

21             But in preparing for arguments, I saw some

22   things that raised concern.

23             THE COURT:  I don't think it would be

24   inappropriate for you to tell me what you've learned.

25   This file is replete with hearsay.

1              MR. DEICHERT:  Well, Your Honor, in the course

2        of preparing for argument, I looked up Jacoby and Meyers

3        jurist number in the Connecticut judicial website.  There

4        were two jurist numbers listed for the firm.  I've

5        searched under both.  One returned no cases at all.  The

6        other returned two cases, the most recent of which was

7        dismissed in 2008.

8              I also looked at Jacoby's website for the New

9        Haven office which they allege in the complaint.  The New

10       Haven office is the only office, among the offices that I

11       saw on their website, that does not use their main JM

12       attorney number, so it appears to be separate.  I called

13       the number listed and the voicemail I received said the

14       Law Offices of -- I unfortunately don't -- the Law Offices

15       of Kenneth Bartlett, not Jacoby and Meyers.

16             Attorney Bartlett is their registered agent of

17       service in the state.  But it's not clear, at least from

18       the voice message, whether he has any affiliation with the

19       firm aside from that.

20             Also Your Honor had asked about whether they

21       were registered at the time the suit was filed.  The

22       answer is no.  They were not registered with the

23       Connecticut Secretary of State's office.  We raised that

24       issue in our motion to dismiss.  They then paid a fine to

25       the Connecticut Secretary of State's office and have since

1      registered a few months after the complaint was filed.

2              Under Connecticut law, there's a door closing

3      statute that raises questions as to whether the post

4      amendment would have been sufficient, but it gets fairly

5      complicated as to whether it applies to federal claims in

6      addition to state law claims.

7              And as far as amending the complaint to correct

8      the caption, Your Honor, we know that leave is generally

9      freely granted, but as plaintiff acknowledged, Judge

10     Kaplan raised that issue in the November 2011 argument.

11     Plaintiffs made no efforts and have may no effort to this

12     point to amend the complaint, to correct the caption, nor

13     have they made any effort to amend their complaint to

14     correct numerous jurisdictional problems that they

15     attempted unsuccessfully to correct in Judge Kaplan's

16     case.

17             So as a result, you know, we've been preparing

18     for argument on a complaint that has not been amended.

19     Your Honor's heard argument today on a complaint that has

20     not been amended, even though they knew of the need to

21     amend several months ago.

22             And so we would respectfully object.

23             We also believe that it's -- in addition to

24     being untimely, we believe it's futile for the reasons set

25     forth in Judge Kaplan's decision.

1           THE COURT:  You refer just now to jurisdictional

2    difficulties that have not been addressed.

3           MR. DEICHERT:  Yes, Your Honor.  Because we were

4    discussing the issue of -- ultimately the Connecticut law,

5    if you don't register with the Connecticut Secretary of

6    State's Office, you are precluded under Connecticut law

7    from bringing suits in courts of this state.

8           There is kind of a split in authority --

9    Connecticut hasn't addressed the issue -- other

10   jurisdictions, there's a split in authority as to whether

11   that would apply to federal courts as well as state courts

12   within the state.

13          And also the question if, assuming for the sake

14   of argument that it applied in federal courts, the

15   question would then become whether plaintiff's post hoc

16   change or correction of the defects would kind of relate

17   back to the initial standing in court.

18          So it's a fairly complicated issue and so we

19   didn't -- ultimately we weren't sure if the fact that they

20   had fixed the defect would alter the analysis.

21          THE COURT:  I see.

22          MR. DEICHERT:  But that's our response on the

23   motion to amend, Your Honor.

24          THE COURT:  Thank you.

25          MR. DENLEA:  Your Honor, in view of the fact

1    that the motion to amend the caption is freely granted, as

2    counsel concedes, and the fact that the procedural

3    irregularity by his concession has been corrected, we

4    would ask the Court to regard it as a correction nunc pro

5    tunc and we would be prepared to proceed with the balance

6    of the analysis as regards to the standing and ripeness

7    issues.

8              THE COURT:  Do you think these facts should be

9    weighed by the Court in considering the equities of the

10   case?  You do seek equitable relief, this is in the nature

11   of an action for an injunction, and I wonder if these

12   facts need to be addressed in considering the equities of

13   the case.

14             A firm that may have no presence in Connecticut,

15   that brought suit when it wasn't registered to do business

16   in Connecticut, never having sought guidance from the

17   state judiciary, a body to whom I owe appropriate respect

18   and deference.

19             MR. DENLEA:  Your Honor, it's interesting that

20   the Court brings this up, because one thing that's

21   distinct in this action as contrasted to New York and New

22   Jersey is that in terms of the deference that the Court

23   may wish to extend to the state judiciary and in terms of

24   how that issue bears on the Court's consideration as

25   regards abstention, distinction between the litigation

1      here as contrasted with New York and New Jersey is that,

2      as the Court's well aware, the abstention doctrine in

3      deference to New York state or, I'm sorry, New York state,

4      New Jersey or Connecticut judiciary, would involve areas

5      where there was an unsettled question of state law.

6              Here in the Attorney General's papers, quoting

7      at page 2, they state in the first full paragraph, "Rule

8      5.4 reflects a policy choice that the Connecticut

9      judiciary, exercising its inherent authority to regulate

10     the legal profession, has embraced for almost 40 years.

11     Although Rule 5.4 has been periodically updated,

12     defendants have not seen fit to meaningful alter its

13     substantive requirements during that time."

14             So this is the Attorney General's expository

15     with respect to their client's perspective on Rule 5.4.

16             Technically could the Court send us to that body

17     to further adjudicate this matter?  The Court can

18     procedurally sidestep the issues here and do just that as

19     was done in New Jersey.  However, in view of the fact that

20     the whole notion of stare decisis as regards to how the

21     Connecticut judicial reviews this and the fact that it's

22     not just been on the books but that it has been embraced

23     for 40 years and that, as the Attorney General states,

24     it's not as if consideration has not been given to

25     changing the rule, but that the defendants have not seen

1    fit to meaningful alter its substantive requirements, I

2    think speaks volumes with respect to how any further

3    proceeding or inquiry as regards that body or another

4    administrative agency that may be affiliated with it, may

5    be an exercise in futility and a waste of not only the

6    parties' resources but just against the concept of

7    judicial economy.

8              THE COURT:  That's consistent with your argument

9    that is made in your papers, and you suggest that it would

10   not be appropriate for me to abstain because we must

11   presume that the state judiciary would be biased.  Do you

12   think that that's something that I'm in a position to

13   actually say?

14             MR. DENLEA:  Your Honor, I think that in this

15   setting that what this Court is in a position to say is

16   that there are fundamental constitutional issues that are

17   uniquely within the purview of Your Honor's mandate to

18   decide these matters and that the state judiciary, in view

19   of the fact that they had the opportunity to sua sponte

20   review this Rule 5.4 over the last 40 years, and as

21   counsel eloquently stated, chose -- saw fit not to

22   meaningfully alter its dictates and have embraced that

23   notion, I think that that gives the Court the foundation

24   to say that I have a clear understanding of how the state

25   feels about this action and if there are constitutional

1    issues involved as regards freedom of speech, due process,

2    equal protection, that it is incumbent on this Court to

3    conduct that analysis.

4         THE COURT:  I can't claim to have a clear

5    understanding of how the state judiciary views this

6    particular controversy.  I don't know.

7         MR. DENLEA:  Well the Attorney General has

8    informed all of us, Your Honor, that they have absolutely

9    no intention of abrogating Rule 5.4.

10        THE COURT:  I think that's an over reading of

11   the Attorney General's position.

12        But dealing with this topic, what do you say to

13   the argument that under the Eleventh Amendment you haven't

14   sued the right defendant, that you would need to amend

15   your complaint in that regard also?  Would you please

16   respond to that?

17        MR. DENLEA:  Your Honor, with respect to the

18   Eleventh Amendment, I believe that in view of the fact

19   that it is the state judiciary through its agents and

20   assigns that is responsible for the enforcement of this

21   action that we do in fact have the right party and that

22   the Eleventh Amendment as regards this Court's ability to

23   determine matters of state law is really an inapposite

24   analysis because, Your Honor, this Court, again, coming

25   back to the constitutional issues --

```
1              THE COURT:  No, no, please, sir, I need to ask
2      you to focus on the Eleventh Amendment.
3              MR. DENLEA:  They're intertwined, Your Honor.
4              THE COURT:  The argument, as I understand it, is
5      that under Section 1983 you may be permitted to amend to
6      name an individual or perhaps more than one individual
7      with enforcement authority and in that way overcome the
8      Eleventh Amendment immunity of the state.
9              Focusing specifically on that argument, what
10     would be your response, please?
11             MR. DENLEA:  Well, Your Honor, if that's the
12     Court's wishes, we would have absolutely no problem again
13     requesting the Court for permission to amend the caption
14     in that regard to reflect the names of the individual
15     enforcement agencies involved.
16             THE COURT:  Do you think that's what the law
17     requires?
18             MR. DENLEA:  I'm not convinced that's what the
19     law requires, but my feelings in this regard are obviously
20     sublimated to Your Honor's feeling, and if that
21     ministerial change is something that the Court would
22     require, we'd have absolutely no problem complying.
23             THE COURT:  Well, the further argument is that
24     under Ex parte Young, if the complaint were permitted to
25     be amended to address this jurisdictional problem, you
```

1       would need to allege an imminent threat of enforcement by

2       that individual defendant.

3                   What do you say to that, sir?

4                   MR. DENLEA:  Well, Your Honor, this is a unique

5       situation because when we talk about an imminent threat,

6       what does imminent threat mean in this setting?

7                   What an imminent threat means is that the

8       plaintiffs in this action would effectively, according to

9       the Attorney General's analysis, be put on the horns of a

10      dilemma, basically risking their law license to go forward

11      with the type of private investment that's contemplated in

12      the complaint.

13                  And as we began our analysis, both in Babbitt v.

14      United Farm Workers and Steffel v. Thompson, those both

15      stand for the proposition that a party's not required to

16      await and undergo a prosecution as the sole means of

17      seeking relief.

18                  So obviously, Your Honor, in a case such as this

19      when the law licenses of the individuals are potentially

20      the stakes of attempting to press their legal rights and

21      their legal claims, both the Babbitt case and the Steffel

22      case stand for the proposition that one need not go to

23      that extent nor put those assets at risk before coming to

24      court and seeking the relief that we seek.

25                  THE COURT:  All right.  I understand that, I

1    think, but let's break that down.

2         Who's law license are we talking about?

3         MR. DENLEA:  Your Honor, it would be

4    presumptively the individuals who are the principals of

5    Jacoby and Meyers, as well as the individual practitioners

6    in the state of Connecticut.

7         THE COURT:  We don't know that there are any

8    individual practitioners in Connecticut.

9         Are the principals licensed in Connecticut?

10        MR. CARTON:  Can I supplement the record in one

11   respect, Your Honor?

12        THE COURT:  Yes.

13        MR. CARTON:  Because as meaningful and

14   interesting the colloquy is, I would suggest it's actually

15   in some respects on the wrong path.

16        THE COURT:  Okay.

17        MR. CARTON:  Jacoby and Meyers' standing in this

18   case was never predicated upon the threatened enforcement

19   action that would be brought against it in the event it

20   were to consummate.  Yes, that would be a collateral or

21   incidental harm that it would suffer if an enforcement

22   action were brought against it, but its standing was

23   primarily predicated upon the injury that exists today,

24   the injury that existed yesterday, the injury that will

25   exist tomorrow in terms of the increased cost of capital

1   that it is experiencing as a result of its inability to

2   access capital markets in the manner in which any other

3   business can.

4          At the present time, Rule 5.4 prohibits a

5   non-lawyer, obviously, from owning an interest.

6          THE COURT:  I understand, but this is an action

7   in which the plaintiff, Jacoby and Meyers Law Offices LLP,

8   comes here seeking extraordinary relief involving the

9   equitable power of the Court.  Consistent with fundamental

10  precepts of equity, I need to first ask:  Who is this

11  plaintiff?  What is the nature of their situation?  Why is

12  it that extraordinary relief is being sought?  And I need

13  to consider the equities of the plaintiff's position.

14         When I do that, I learn that the plaintiff comes

15  here using the wrong name, without being licensed to do

16  business in Connecticut and perhaps having no actual

17  presence in Connecticut, and with no claim to having

18  inquired of the state judiciary about this problem.

19         I don't think you need to be a stick in the mud

20  to pause at that point and ask:  Is this an appropriate

21  thing to be doing?

22         A traditionalist I'm sure would suggest it's

23  not, that a member of the Connecticut Bar owes the state

24  judiciary respect and deference too, and a simple inquiry

25  might be made in advance of bringing an action in federal

```
 1    court in which you assert that they're biased.  That's
 2    also part of the total picture.
 3              So I don't think it's on the wrong path.  I
 4    think it's the starting point.
 5              MR. CARTON:  And I appreciate, Your Honor, the
 6    equity consideration that the Court is exploring this
 7    morning.  I would respond simply and respectfully by
 8    saying that the considerations would be no different than
 9    if it were a solo practitioner having graduated from law
10    school yesterday than it would be if Shipman & Goodwin
11    were bringing this application as a several hundred person
12    law firm.
13              THE COURT:  But they're not.
14              MR. CARTON:  Right.  But that's the point, Your
15    Honor.
16              Jacoby and Meyers has lawyers licensed to
17    practice, maintains a presence in the state of
18    Connecticut, whether that presence is as robust as a firm
19    ten times its size or more significant than the recent law
20    school graduate, the issue is the same.
21              THE COURT:  Right.
22              MR. CARTON:  The issue is each of those
23    attorneys licensed to practice in the state of Connecticut
24    is currently restricted from pursuing capital in the
25    manner in which Jacoby and Meyers wishes to proceed in
```

1    terms of its expansion.

2              So it's not so much a question of the equities

3    being different or different deference being given to the

4    size or scope or magnitude of the particular plaintiff who

5    could come before Your Honor, the challenge is one

6    predicated upon the federal constitution.

7              It would be no different, and we've referred to

8    this in different jurisdictions and I bring it to Your

9    Honor's attention here as well, there are parallels to be

10   drawn with respect to the desegregation efforts that took

11   place in the 1960's, when the Supreme Court concluded that

12   separate but equal was unconstitutional and various state

13   and municipal legislatures and county ordinances tried to

14   pass laws, and ultimately in Cooper v. Aaron they said you

15   couldn't do that, you could not subrogate a Supreme Court

16   decision to the wishes of local governments.

17             THE COURT:  That's a remarkable analogy,

18   counsel.

19             MR. CARTON:  It is.  I think there are a number

20   of analogies to --

21             THE COURT:  What do you say to the Ex parte

22   Young problem?

23             MR. CARTON:  I say it's form over substance.  In

24   terms of the Ex parte Young, to me it would be a

25   ministerial and relatively easy fix if we were to conclude

1      that we needed to name the individual enforcement

2      officers, which again would elevate form over substance.

3      It wouldn't get to the heart of the issue.

4               THE COURT:  What about the requirement that you

5      show an imminent threat?

6               MR. CARTON:  My response would be that not only

7      is there an imminent threat, there's an actual threat.

8      There's an injury that Jacoby and Meyers sustained at the

9      very start of the business day today, which is the same

10     injury they sustained last Friday during working hours.

11     They do not have the ability to access the capital in the

12     way they wish.

13              THE COURT:  Does Jacoby and Meyers have an

14     arrangement with someone in which they wish to invest?

15              MR. CARTON:  The extent to which I am at liberty

16     to share with the Court, I can share with the Court what

17     we shared with Judge Kaplan in New York.

18              We have specifically identified the names of

19     three high net worth individuals, each of whom are

20     prepared to consummate an investment in Jacoby and Meyers

21     in exchange for an ownership interest.

22              There are also corporate entities that obviously

23     business confidences dictate that I not divulge at this

24     time.

25              But in response to Judge Kaplan's questions

1    regarding the nature of the transaction that Jacoby and

2    Meyers wishes to consummate, one of the facts that we

3    amended our pleading in New York to allege was the

4    specific identity of those individuals.  And in fact, I

5    believe as recently as last week, Bloomberg News actually

6    reported on who those individuals are and the fact that

7    they were prepared to consummate a investment in Jacoby

8    and Meyers.

9            THE COURT:  Are you able to reveal how the

10   investment would work?

11           MR. CARTON:  Not beyond satisfying the language

12   of the statute, which is that those individual investors

13   would own an interest which is currently the proscription

14   that Rule 5.4 prevents.

15           THE COURT:  Thank you.

16           MR. CARTON:  Effectively it would be a capital

17   infusion into Jacoby and Meyers, they would then own an

18   interest in the overall profitability of the firm not

19   unlike any other limited partner or member of an LLC.

20           THE COURT:  Thank you.

21           MR. CARTON:  Thank you.  And thank you, I

22   recognize the unorthodox approach, but given that we're

23   obviously trying to bring all these issues to the

24   forefront, I appreciate the opportunity.  Thank you.

25           THE COURT:  Not at all.

1        Yes, sir?

2            MR. DENLEA:  Yes, Your Honor, just in echoing

3    what my partner and the Court had been discussing, when

4    Your Honor said that it's a remarkable analogy to certain

5    cases involved in the civil rights struggle.

6            It's really an apt analogy because what had

7    happened in that setting in Aaron v. Cooper was that in

8    1957, Thurgood Marshall, a U.S. attorney, found himself

9    in -- the district court in Arkansas found himself facing

10   a situation where he was told very much what we've been

11   told, that why should we even bother reaching the

12   questions of the constitutional issues involved in this

13   matter, because even if we get past the hurdle of this

14   matter immediately before us, there are ten more separate

15   but equal statutes right behind that would take their

16   place and prevent the same relief that you seek.

17           And the Supreme Court of the United States in

18   1958 in that setting said that that is not to be

19   permitted, that basically, my words not theirs, that one

20   cannot use unconstitutional statutes and regulations as

21   scaffolding to buttress each other such that they can

22   overcome the constitutional claims in replacement for this

23   court.

24           So accordingly, Your Honor, with respect to --

25   and unfortunately Judge Kaplan an in New York completely

```
 1      ignored that part of the authority and that Supreme Court

 2      decision with respect to his analysis, and that's why we

 3      think that it's particularly appropriate that this Court

 4      as a court of coordinate jurisdiction, examine anew the

 5      entire issue because the merits of this case have not been

 6      reached yet and the procedural hurtles that have been

 7      placed in our path to this point should not, under the

 8      authority cited, particularly in Aaron v. Cooper, should

 9      not preclude that analysis.

10              THE COURT:  Do you think that there is any merit

11      to the proposition that an individual judge should not

12      preempt the rule-making process that is followed with

13      regard to the rules of professional conduct whereby

14      everybody has a chance to be heard and matters are

15      deliberated over at some length and public comment is then

16      solicited again and you go through a rather painstaking

17      process that ensures everybody has a chance to be heard?

18              MR. DENLEA:  Well, Your Honor, that presupposes

19      a legitimate state interest and a policy that has not been

20      as entrenched by four decades of embracement, to use the

21      Attorney General's word.

22              So as far as that goes, Your Honor, it's our

23      opinion that it is particularly and uniquely this Court's

24      province to look past what the state courts have done in

25      this regard.
```

```
1              THE COURT:  I think your conception of the role
2    of the district judge in the context of racial segregation
3    makes sense certainly, that's our history.  But I wonder
4    if that conception does obtain in the very different
5    scenario before the Court today.  You're talking about the
6    regulation of the legal profession, which is a matter
7    entrusted to the state judiciary, having to do with the
8    economic concern of your client engaged in the practice of
9    law in Connecticut perhaps under the authority of the
10   licensing body, the state judiciary.
11             Aren't those two very different?
12             MR. DENLEA:  No, Your Honor.
13             THE COURT:  Doesn't the role of the individual
14   district judge in the latter scenario appear very
15   different to you?
16             MR. DENLEA:  Your Honor, as a matter of fact --
17             THE COURT:  If it doesn't, I'm quite surprised,
18   counsel.
19             MR. DENLEA:  Well, it doesn't, and if the Court
20   will permit, I'll explain why.
21             THE COURT:  Please.
22             MR. DENLEA:  This precise path has been tried by
23   your predecessors in the Bates action as regards attorney
24   advertising.  Each and every one of the states had a
25   proscription against attorney advertising.  And ironically
```

1    it was our client who was pressing that case in that forum

2    as well.  It was only in that setting with district court

3    judges and ultimately right on up the appellate line that

4    the current law as regards attorney advertising came into

5    being.  Because district courts stepped in, the appellate,

6    the circuit courts stepped in and aggregated the

7    individual state proscriptions.

8            And I think that what's interesting for the

9    Court's analysis is that the fulcrum in that discussion

10   was the notion that it was the blanket prohibition, the

11   complete banning of attorney advertising that was the

12   offensive part of the statute.

13           And similarly here, Your Honor, it's the blanket

14   proscription of access to private equity capital that is

15   what's offensive to the Constitution.

16           And, Your Honor, furthermore, in terms of

17   whether it's -- there's a propriety in terms of Your Honor

18   intervening and becoming involved in what you may

19   momentarily perceive as being a matter for the state

20   judiciary, it's interesting to note that one of the first

21   analyses, and this is something that is the -- often the

22   part that the Attorney General would leave off the

23   analysis involving the case of Pike v. Bruce Church is

24   that the Court must do an analysis as to whether or not

25   there is a less intrusive or less invasive way of going

1    about the stated objective, in this case the regulation of

2    attorney conduct.

3         And pointedly, while with respect to the laws of

4    the State of Connecticut and the regulations of the State

5    of Connecticut, Rule 5.4 is actually unnecessary and

6    superfluous because there are other rules.  Specifically:

7    Rule 2.1, in terms of the representation of the client,

8    the lawyers will exercise independent professional

9    judgment and render candid advice.  Rule 7.4 and 7.3 with

10   respect to both advertising and personal contact with the

11   perspective clients, and Rule 1.6 with respect to that a

12   lawyer shall not reveal information related to the

13   representation of a client unless the client gives him

14   consent.

15        So with respect to the Court's concern as to

16   whether or not the conduct of the attorneys could continue

17   to be regulated by the courts, all of those regulations

18   and others more than cover that area.

19        So the analysis is at this point the Rule 5.4 as

20   it seeks to cloak itself in regulating attorney conduct

21   really does nothing of the kind.  What it does is it

22   regulates the commerce of law, not the conduct of the law,

23   and that it has been inappropriately linked to these other

24   regulations in an attempt to give it the cloak of

25   legitimacy with respect to regulating attorney conduct.

1              In point of fact, when one does an analysis as

2    to the origins of this regulation, one finds that it

3    really stems from a 1909 criminal statute in the state of

4    New York that was really a means of economic protectionism

5    where local practitioners in New York were attempting to

6    prevent corporations from setting up prepaid legal

7    services.  So they enacted a criminal statute stating that

8    private corporations could not invest in law firms.

9              And the problem with that analysis -- and that

10   was unabashedly held open as being the reason for the

11   predecessor of Rule 5.4 -- but in 1978 that analysis ran

12   into difficulty in the case of the City of Philadelphia v.

13   New Jersey, because the Court stated it is inappropriate

14   for a state to enact legislation that would inure to the

15   economic advantage of a particular group.  So this

16   economic protectionism was unmasked for what it really

17   was, and then all of a sudden the legal fiction of all of

18   the collateral salutary effects that were claimed with

19   respect to regulating attorney conduct came into being.

20             What we know from the analysis that I just gave

21   the Court is that those rules and their predecessors were

22   already in place, so this was effectively a grafting of

23   Rule 5.4 and its predecessor onto these other regulations

24   in the hopes and attempts to try to cloak it with an era

25   of legitimacy which it otherwise doesn't deserve.

1          THE COURT:  Coming back to the Bates precedent,

2     have you looked to see whether district judges abstained

3     pending developments on the state side or simply leapt

4     into the breach and ruled?

5          MR. DENLEA:  I believe that they ruled directly,

6     Your Honor.  That had not been a matter of our inquiry

7     prior to this.  If further analysis finds that to be

8     incorrect, we would request permission to communicate that

9     to the Court.

10          THE COURT:  To be clear, you haven't done the

11     research but --

12          MR. DENLEA:  No, it's not that, Your Honor, it's

13     that Your Honor's specific inquiry with respect to whether

14     or not there was a requirement of doing collateral

15     administrative remedies prior to the district court

16     ruling, that had not been germane to any of the matters

17     before the court and was not researched.

18          THE COURT:  So you don't know.

19          MR. DENLEA:  As I stand here, I do not, sir.

20          THE COURT:  Okay, thank you.

21          MR. DENLEA:  Anything further, Your Honor?

22          THE COURT:  No, thank you.

23          MR. DENLEA:  Okay, thank you, Your Honor.

24          THE COURT:  Mr. Deichert, would you like to

25     respond?

1    MR. DEICHERT:  Briefly, if I may, Your Honor?  I
2    just want to clarify a few things.
3         The idea that the Connecticut judicial branch
4    believes that Rule 5.4 serves an important policy does not
5    mean that it would necessarily apply in the situation, in
6    every situation, or regardless of the facts of the case.
7    I mean, ultimately, you know -- and the idea that
8    plaintiffs are -- plaintiff is saying that the state
9    judiciary is inherently biased and unable to adjudicate
10   these claims is, quite frankly, insulting.  I mean,
11   ultimately there's no evidence to indicate that.
12        As Your Honor pointed out, they've made no
13   effort to get any kind of ruling from any state body.  And
14   the Judges of the Superior Court, who are the defendants
15   in this case, ultimately would not be the final deciding
16   body for the determination of whether Rule 5.4 is valid.
17   If were an enforced through the grievance process, it
18   would go through the Superior Court and ultimately be
19   subject to review by the Connecticut Supreme Court and the
20   United States Supreme Court on certiorari.
21        So ultimately the idea that the state judiciary
22   is inherently biased should be a non-starter in our
23   opinion, Your Honor.
24        They raise the specter of them losing their law
25   licenses.  That kind of gets us back into the choice of

1    law questions we were discussing.

2            Under Connecticut's Rule 8.5 -- 8.5(b)(2)

3    specifically says that a lawyer shall not be subject to

4    discipline if the lawyer's conduct conforms to the rules

5    of a jurisdiction in which the lawyer reasonably believes

6    the predominant of the effect of the lawyer's conduct will

7    occur.

8            So, as we were saying, Your Honor, given the

9    lack of presence of Jacoby and Meyers in this case, and

10   given the nature of the rule at issue which governs

11   internal firm conduct, it's not -- certainly not clear

12   that anyone would be losing a law license based on any

13   potential enforcement.  And in fact Attorney Carton

14   apparently concedes there is no imminent enforcement.

15           And as Your Honor was trying to get an answer on

16   the Ex parte Young issue, we believe that is the answer.

17   There is no imminent risk of enforcement here.  And the

18   fact that plaintiffs failed to properly plead an Ex parte

19   Young claim shows kind of the -- why the hypothetical

20   nature of their claim is a problem.  There is no one they

21   can name.  No one has enforced it, no one has threatened

22   to force it.

23           And ultimately the judges of the Superior Court

24   are responsible for the creation of the rule.  They do

25   have some enforcement authority.  But ultimately the

1    primary enforcement authority resides elsewhere.  So it

2    highlights the hypothetical nature of their claims and the

3    reasons why they lack standing in this case.

4            THE COURT:  What is a lawyer acting in good

5    faith supposed to do?

6            MR. DEICHERT:  Your Honor, one option would be

7    to seek a, like, a decision from the Connecticut Bar

8    Association to determine whether the rule applies in the

9    specific factual context.

10           Another potential option which plaintiffs -- I

11   don't know if plaintiffs have explored -- they may be able

12   to bring a declaratory judgment action in state court

13   seeking, you know, a ruling.  That's something that, you

14   know, we would have to decide depending on the situation

15   what our response to that would be.  But plaintiffs

16   certainly haven't stated that that's not available.

17           THE COURT:  In the New Jersey case, the Court

18   remitted the matter to a state authority?

19           MR. DEICHERT:  It did, Your Honor.

20           THE COURT:  Does that have any parallel here?

21           MR. DEICHERT:  It could.

22           Essentially -- but the New Jersey setup is

23   different from the Connecticut setup.  My understanding

24   from the New Jersey action is that there was an actual

25   process through the New Jersey court system whereby you

1    could obtain a binding decision on kind of a given

2    advisory opinion.

3              Connecticut's setup is different.  It would be

4    up to Your Honor whether that would be something that

5    would be appropriate under the circumstances.

6              But I wanted to highlight that there is that

7    distinction, which may counsel potentially against

8    following the New Jersey approach here.

9              But also Judge Sheridan in New Jersey had not

10   had the benefit of Judge Kaplan's decision in New York.

11   His decision was issued prior.  We submit that Judge

12   Kaplan's decision really analyzes the issues carefully and

13   establishes the plaintiffs lack standing.  And to the

14   extent that plaintiffs are complaining of an impediment of

15   their ability to raise capital, that impediment exists

16   regardless of Rule 5.4.  An impediment existed under New

17   York law, and it's going to exist regardless of what

18   happens here, particularly given that this court,

19   defendants in this case, have no role in enforcing New

20   York law at all.  At least in the southern district, the

21   defendants there were involved in the New York judicial

22   system.

23              So Your Honor's concerns about interfering with

24   Connecticut's judicial system are, we believe, completely

25   appropriate and we think even more so trying to extend

```
 1      that to interfere with New York's judicial system in a
 2      situation where the New York Attorney General has already
 3      represented the New York defendants in that case and a New
 4      York district judge has addressed it and the plaintiffs
 5      have the ability to seek an appeal, which they haven't
 6      done yet, and I'm not sure they plan to.
 7                THE COURT:  Counsel?
 8                MR. DENLEA:  Your Honor, if I may?
 9                Initially with respect to counsel's comments, I
10      was present in the room with Judge Sheridan, and point of
11      fact he was made aware of the New York proceedings.  It
12      was actually an Attorney General from the State of New
13      York who was present and gave the -- his own chapter and
14      verse of what had gone on.
15                But I think that perhaps we can pull away the
16      veil with respect to some of this back and forth that's
17      gone on here.  Present in court with us today are two
18      members from the Connecticut State Attorney General, an
19      attorney representing the CBA, an attorney representing
20      the CTLA.  My partner and I would be willing to go into an
21      attorney room with these individuals and just ask them
22      point blank, under what circumstances would your
23      organizations and your enforcement agencies be willing to
24      permit private investment in a law firm?  And then perhaps
25      we can build from the ground up so that we don't have to
```

1    waste everyone's time and resources going through

2    administrative agencies and saying, well, what you're

3    proposing isn't acceptable, and do that three or four or

4    five times.

5            Why don't we just stop the charade and say,

6    there is going to be an enforcement action if our clients

7    seek private equity funding, and let's get to the bottom

8    of what these gentlemen would permit.

9            THE COURT:  For a minute there I thought you

10   were agreeing that I should abstain?

11           MR. DENLEA:  No, sir, not at all.  If anything,

12   it's hyperbole.  It's exaggeration to prove a point.

13           Everyone in this room knows there would be an

14   enforcement action.  It's beyond cavil to suggest

15   something to the contrary.

16           MR. DEICHERT:  Your Honor, again, whether there

17   be an enforcement action would depend on the facts of the

18   case.  And ultimately as we've -- we believe we've made

19   clear, there is no basis to conclude whether there would

20   be one.  And if so, whether that would apply Connecticut

21   law or whether it would apply New York law.  Given the

22   lack of presence here, you know, there's really it's

23   significantly likely that Connecticut would choose to

24   apply New York law.

25           I mean, these are -- and the idea that they're

1    saying let's stop this charade before we waste anybody

2    else's time, Your Honor, we didn't bring this action.  If

3    they had -- they could have sought -- made efforts to try

4    to get some kind of declaratory ruling or some kind of

5    clarity.

6              Had they done so, certainly their case would be

7    stronger, but they haven't.

8              MR. DENLEA:  If I might, Your Honor, one need go

9    no further than counsel's papers in saying that the

10   defendants have not seen fit in 40 years to meaningful

11   alter the substantive requirements of Rule 5.4.  Can we

12   not take that at its word for what the plain language

13   means?

14             THE COURT:  Okay.  At some point I need to

15   adhere to basic procedure, although I do enjoy the back

16   and forth.

17             Is there anything that you wanted to add,

18   Mr. Deichert before we hear from the counsel for the

19   amici?

20             MR. DEICHERT:  No.  I believe we've addressed

21   the issues clearly, Your Honor.  Is there anything else

22   that you'd like to hear from us?

23             THE COURT:  Not at this time, thank you.

24             MR. DEICHERT:  Thank you.

25             THE COURT:  Yes, sir?

1          MR. SHEA:  Good morning, Your Honor, Kevin Shea

2     Clendenen & Shea on behalf of the Connecticut Bar

3     Association amicus.

4          Your Honor, first obviously we rise in support

5     of the motion to dismiss.  We join with the Attorney

6     General.  I just want to highlight a few of the issues

7     that we've briefed for the Court, that all the parties

8     have extensively briefed the issues, but since there's

9     been some discussion first about the CBA's role in the

10    rule-making process, that is of the greatest concern to

11    us.  Our brief actually spent the most time discussing

12    this rule-making process, and we think it's an important

13    one.

14         We don't think this is just a charade.  The

15    importance to realize here, this is an all or nothing game

16    here from Jacoby and Meyers.  They're not seeking an

17    amendment to Rule 5.4 to allow this consistent with all

18    the other forces that prevail upon the practice and the

19    things that would uphold this passive investment they're

20    talking about.  We don't know what this looks like.  We

21    have no idea what this proposal is because they have not

22    submitted to the rule-making bodies any proposal for

23    consideration.  That's a real primary problem with this

24    whole cause of action.

25         This is an all or nothing game.  They are asking

1 the Court to get rid of 5.4 in its entirety. They're not

2 asking you to red pencil it, to write in reasonable

3 restrictions to ensure that all the other things that

4 we're concerned about won't happen here. They're asking

5 for it to be thrown away and we think that that is very

6 telling of their motives here. Because as Your Honor has

7 correctly pointed out time and again, there is a process,

8 the Connecticut Bar Association is part of that process.

9 It has two committees that bear directly on these issues:

10 The Committee on Professional Ethics and the Committee on

11 the Unauthorized Practice of Law. Those committees

12 publish formal opinions -- the Connecticut Bar Association

13 publishes formal opinions by each of those committees on

14 specific inquiries about specific situations just like

15 this. Application of the rules of professional conduct to

16 specific situations.

17    There has been no inquiry by Jacoby and Meyers

18 to the Connecticut Bar Association about what it believes

19 would be offensive to the professional ethics involved in

20 lawyering.

21    Your Honor, as we and the Attorney General has

22 briefed extensively, Rule 5.4 is the product of lengthy

23 and deliberate process involving the ABA, premised on

24 model rules, the Connecticut Bar Association and the

25 Connecticut Judicial branch.

1          The American Bar Association has a 20/20

2     commission looking into precisely this issue right now.

3     We're not aware that Jacoby and Meyers has participated in

4     that process to give its views on a reasonable amendment

5     that might meet everyone's needs to ensure the provision

6     of legal services to low and moderate income people which

7     they profess to be their goal.

8          We've addressed elsewhere in the brief, and I'll

9     let the Connecticut Trial Lawyers Association speak to the

10    legitimacy of that representation with this plaintiff, but

11    if you take them at their word that that's what they're

12    concerned about, first of all, it doesn't apply to

13    contingent fee cases because that's the same fee

14    everywhere, it's a contingent fee.  We believe that to be

15    primary, if not entirely, the interest of the plaintiffs

16    here, which moots their entire premise for their lawsuit.

17          THE COURT:  I'm sorry, I didn't follow you

18    there.

19          MR. SHEA:  Meaning that Jacoby and Meyers is

20    interested in plaintiff's personal injury cases and there

21    is no concern, none whatsoever, about being able to

22    provide those for low or moderate income people.  The fee

23    structure on those contingent fee cases is just that, it's

24    a contingent fee.  There's not a problem for access.

25    Quite the contrary.  Everybody decries there's too many

1    personal injury lawsuits.

2          We believe that the materials we've submitted,

3    as well as those submitted by the Connecticut Trial

4    Lawyers Association show the true motives of Jacoby and

5    Meyers rather to penetrate more markets to increase their

6    share of the contingent fee plaintiff's work, and that's

7    not a purpose here.

8          THE COURT:  So you envision this plaintiff

9    undertaking to acquire personal injury law firms like the

10   Australian firm?

11         MR. SHEA:  Correct.  That's exactly what we

12   think is happening here, a national personal injury firm

13   that increases its penetration by an infusion of capital

14   that allows it to open up offices, satellite offices all

15   throughout the country, and just take a greater share of a

16   market that's already being well served and, to some

17   people's opinions, too well served.

18         Your Honor, the Judges of the Connecticut

19   Superior Court have their own rule-making committee.  They

20   seek input from the public.  They seek input from the bar

21   association.  We're not aware that the plaintiffs have

22   sought input into that process at all.

23         Again, they could propose a revision of the rule

24   that meets perhaps, you know, with some restrictions, like

25   the Washington D.C. rule that has been allowed, with some

1    restrictions.  They have not proposed that rule.  They

2    want it thrown away.

3            We agree with the Court, this is not the way to

4    do it.  Or we agree with the concern of the Court that

5    this is not the proper way to do it.  I should correct

6    that.

7            Briefly, Your Honor, on the standing issue that

8    was recently decided by the Southern District of New York,

9    we join in that argument as well and only seek to point

10   out in addition to the New York state laws that are also

11   additional hurtles that the plaintiff can't overcome if

12   5.4 is thrown out, there are Connecticut criminal

13   statutes.  We've cited four of them that prohibit

14   non-lawyers from sharing in fees, from referring clients,

15   from being involved in legal work:  51-86, 51-87, 51-88

16   and 53-340a.  Those are all additional hurtles that

17   further reinforce the plaintiff's lack of standing because

18   they haven't challenged all of those things, they haven't

19   come up with a plan for how they're going to get around

20   those other additional prohibitions which makes any ruling

21   by this Court merely advisory.

22           If they want an advisory ruling on this, they

23   can get one from the Connecticut Bar Association.  They

24   can submit an inquiry and get an advisory opinion about

25   this.

1           Additionally, Your Honor, the Securities and

2   Exchange Commission, the disclosures required by the

3   Securities and Exchange Commission are by their very

4   nature in direct conflict with the attorney/client

5   privilege.  They are a publicly traded entity.  They are

6   required to disclose the nature of their contracts on

7   which their business relies, the nature of the clients on

8   which their business relies, identifying specifically the

9   contracts, specifically the clients.  That's what public

10  filing entails.  That's in direct conflict to the

11  attorney/client confidence required by the practice of

12  law.

13          And finally, Your Honor, just one of the

14  constitutional issues touched upon, and we just think it's

15  important if the Court reaches any of these issues, on the

16  First Amendment issue, the plaintiff fails to deal

17  entirely with the fact that the association it is seeking

18  is a purely commercial association and nothing has

19  changed.

20          The United States Supreme Court's decisions from

21  Lawline on through, they say that that's entitled to the

22  most minimal level of protection.

23          The Citizens United did not change that.  They

24  overlook entirely the fact that Citizens United involved

25  political speech, which is entirely different than a

1    commercial relationship.

2            Barring any questions from Your Honor, thank

3    you.

4            THE COURT:   Thank you.

5            MR. BAILIN:   Good morning, Your Honor, Paul

6    Bailin, Shipman & Goodwin with the Connecticut Trial

7    Lawyers Association.   Thank you very much for the

8    opportunity to speak this morning.

9            As in our brief, Your Honor, our concern is

10   primarily with the background policy questions.  I know

11   Your Honor has expressed that those are not your top

12   concerns, so I'll try to keep my remarks very brief this

13   morning.

14           Your Honor, Judge Kaplan dismissed the sister

15   suit in New York in part because other laws preclude

16   relief that the plaintiff is seeking.  What we're arguing

17   here is really the flip side of that coin, that each legal

18   system is a complex structure and you can't just pull one

19   piece of the structure out and leave the rest intact.  The

20   plaintiff ignores over a century of practice in

21   Connecticut and instead focuses on what's happening in

22   England and in Australia.

23           In this case, to find Rule 5.4 unconstitutional,

24   and in its entirety, would really not only eliminate that

25   rule, but would bring the entire rule system into

1    question, and so I think that would be quite extreme.

2            The plaintiff offers two possible benefits of

3    eliminating Rule 5.4:  One that it will help the poor, one

4    that it will help Connecticut lawyers.  As far as I can

5    tell, those two claims are unrelated.  In other words, the

6    purported benefit for the Connecticut lawyers is not that

7    we would be better able to serve the poor, but we will be

8    better able to serve the rich and compete with others in

9    that regard.

10           As to the poor, Your Honor, there's simply no

11   information that the minor drop in the prices of services

12   that they might be able to achieve by lower cost equity

13   financing or by keeping the economy to scale would somehow

14   solve this problem.

15           We've just gone through a four or five year

16   period in our economy where we've had a glut of new law

17   graduates, many of them who anecdotally have been forced

18   to work for minimum wage jobs.  At the same time we've had

19   a drop in real estate prices.  So to the extent that cost

20   is really the issue, a company like Jacoby could have

21   taken this opportunity to hire new law graduates, buy up

22   the cheap real state and offer these services to poor that

23   they claim to want to help.  The fact that that didn't

24   happen seems to me very unlikely that having four percent

25   interest on their capital rather than five or six percent,

1       seems unlikely it's going to change the situation here.

2                 And the other side of the claim seems to be

3       we're not competing with Australia and United Kingdom.  As

4       I indicated in our brief, there's no indication those

5       firms are trying to compete in the Connecticut market.

6       There's some indication they feel like they can't

7       precisely because of Rules like 5.4.  So perhaps there's

8       some worry about competing in the global economy, but

9       there's no sense that legitimate ethical Connecticut firms

10      are unable now to earn a living in the state of

11      Connecticut.

12                On the flip side, what we suggested is that

13      getting rid of Rule 5.4 would not only abrogate that rule

14      but would bring the entire rule's regime into question,

15      perhaps cause serious ethical problems or concerns for our

16      clients.  They really havn't given any good service to any

17      possible solution to this problem or given any sense why

18      the possible harm to the interests of our clients would be

19      justified based on any sort of benefits, and so we simply

20      don't see any possible basis for making this choice.

21                Ultimately it is a political question.  The

22      changes that would be involved are so interrelated and

23      complicated that they're ones best left to the people of

24      Connecticut.

25                So thank you, Your Honor.

1          THE COURT:  Thank you.

2          MR. CARTON:  Your Honor, may I just briefly

3    respond to each of the amici as they each made a similar

4    point that I'd like to address in one regard.

5          Each amici suggests that in seeking the

6    abolition of Rule 5.4 nothing will fill its void.  And in

7    that respect, I think that misconstrues the nature of the

8    challenge and I don't think that the two are necessarily

9    mutually exclusive, that there wouldn't be some type of

10   administrative or quasi judicial structure that wouldn't

11   be imposed in the absence of Rule 5.4.

12         It's not Jacoby and Meyers' burden to come forth

13   and present this Court or any other Court with an

14   alternative construct that might ameliorate the other

15   ethical concerns on which they say Rule 5.4 was built.

16   Jacoby and Meyers' challenge, quite simply, is directed at

17   the blanket suppression that Rule 5.4 currently prohibits,

18   and my colleague referred to that.

19         But in that regard, if I could just redirect the

20   Court's attention, there is significant Supreme Court

21   guidance in this regard.  You can look both to the Bates

22   decision in which the Court held, in holding that

23   advertising by attorneys may not be subjected to blanket

24   suppression, we of course do not hold that advertising by

25   attorneys may not be regulated in any way.

```
 1              Jacoby and Meyers has said as much in its

 2     opposition papers.  It's the blanket suppression of

 3     outside capital that it believes is unconstitutional.

 4     That's not to suggest that if an alternative structure

 5     were implemented, such as that in the District of Columbia

 6     or such as that in Australia or the United Kingdom --

 7     whether it be limitations on the percentage of outside

 8     equity, whether that be the fitness to own requirements,

 9     whether that be management committees, whether that be

10     requiring non-lawyers to agree to abide by ethical codes

11     of conduct that lawyers are otherwise required to abide by

12     as a matter of licensure -- that those things couldn't be

13     entertained, and might ultimately be necessary to the

14     extent that the field would continue to be regulated.

15              But it's the blanket suppression, and that

16     blanket suppression that the Court talked about, being

17     constitutionally infirm in Bates, continued up through its

18     most recent pronouncement in Bates, because in Bates they

19     said a similar thing when they remarked that the

20     government may regulate corporate political speech through

21     disclaimer and disclosure requirements, but it may not

22     suppress that speech altogether.  That is what this

23     lawsuit is all about, the blanket suppression that Rule

24     5.4 currently commands.

25              THE COURT:  All right.
```

1              Mr. Deichert, I'll give you the last work as the

2    movant.

3              MR. DEICHERT:  Your Honor, I'll be brief.

4              I think we've responded well to their issues in

5    our papers, so I don't think we'll repeat our arguments,

6    and I believe Your Honor understands our jurisdictional

7    arguments and so I'll just thank the Court for its time.

8              THE COURT:  All right, thank you all.  I

9    appreciate your coming here today.

10                  (Proceedings adjourned at 11:16 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3                In Re: GALE vs. CHICAGO TITLE

4

5

6              I, Darlene A. Warner, RDR-CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages are a true and accurate transcription of

10   my shorthand notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13

14

15
                        /s/_____
16
                         DARLENE A. WARNER, RDR-CRR
17                         Official Court Reporter
                         450 Main Street, Room #223
18                       Hartford, Connecticut 06103
                            (860) 547-0580
19

20

21

22

23

24

25